# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 11, 2011

## STATE OF TENNESSEE v. ROGER EUGENE DALY

**Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2575     J. Randall Wyatt, Judge**

---

**No. M2010-00535-CCA-R3-CD - Filed June 10, 2011**

---

The Defendant, Roger Eugene Daly, was indicted for first degree murder during the perpetration of a theft, first degree premeditated murder, especially aggravated robbery, aggravated arson, and abuse of a corpse. A jury convicted him of first degree murder in the perpetration of a theft, first degree premeditated murder, aggravated robbery, a Class B felony, setting fire to personal property or land, a Class E felony, and abuse of a corpse, a Class E felony. See Tenn. Code Ann. §§ 39-13-202, -13-402(b), -14-303(b), -17-312(b) (1997). The trial court merged the two murder convictions and sentenced the Defendant to life imprisonment. For his other convictions, the Defendant was sentenced as a Range II, multiple offender to sixteen years for aggravated robbery, eight years for setting fire to personal property, and four years for abuse of a corpse. The trial court ordered that the setting fire to personal property and abuse of a corpse sentences run concurrently with each other but consecutive to the Defendant's life sentence, for a total effective sentence of life plus eight years. In this direct appeal, the Defendant raises the following issues for our review: (1) The State presented insufficient evidence to support his convictions for first degree murder in perpetration of a theft, first degree premeditated murder, aggravated robbery, setting fire to personal property, and abuse of a corpse; (2) The trial court erred in failing to require the State to elect or specify the object of the theft with regard to the first degree murder in perpetration of a theft count and the aggravated robbery count; (3) The State failed to prove an underlying felony to support the Defendant's "felony murder" conviction; (4) The trial court erred in failing to grant a mistrial when a detective testified that the Defendant had a criminal history; (5) The trial court erred when it allowed a photograph of the victim's charred body into evidence; and (6) The trial court erred when it allowed testimony regarding an assault on a witness by the Defendant's brother. During our review, we discovered that, for count four, the trial court erroneously entered a judgment reflecting the offense of arson, a Class C felony, and the corresponding statute section, rather than the offense of setting fire to personal property or land, a Class E felony. On that count, the trial court sentenced the Defendant within the range for a Class C felony. Thus, on count

four, we must remand to the trial court for the entry of a corrected judgment and for resentencing within the range for a Class E felony. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Paul J. Bruno, Nashville, Tennessee, for the appellant, Roger Eugene Daly.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel, Victor S. Johnson, III, District Attorney General; and Benjamin Ford, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

Shortly before 4:00 a.m. on May 29, 2001, the body of Dallie Marlene Wilkerson ("the victim") was found burning in her husband's vehicle on a dead-end street in South Nashville. The Defendant and his brother, Sonny Daly, were charged with her murder when, during the July 2008 term, a Davidson County grand jury returned an indictment alleging that the two men committed the offenses of first degree murder during the perpetration of a theft, first degree premeditated murder, especially aggravated robbery, aggravated arson, and abuse of a corpse. The Defendant was tried separately from his brother and his trial was conducted October 20-24, 2008.

Frank Wilkerson, the victim's husband, testified that, around 3:00 a.m. on May 29, 2001, the victim left their house and told him that she was going to buy gas and cigarettes. He stated that he observed the victim talking on the telephone, at a very low volume, right before she left the house. The victim left the house that morning in her husband's vehicle, a white Nissan Altima. Mr. Wilkerson said he did not give anyone permission to set fire to his vehicle, and he did not give anyone, other than the victim, permission to drive his car.

Assistant Fire Marshal Robert Hunter testified that, in his previous capacity as an arson investigator for the Nashville Fire Marshal's Office, he investigated the fire in the victim's husband's vehicle. He said that the samples he took from the car tested negative for the presence of accelerants. Assistant Fire Marshal Hunter said that he determined that the fire was started when some corrugated boxes in the back seat, on the passenger's side of the

car, were lit. He recalled that the victim's body was found on the floor between the front and back seats on driver's side of the car.

Dr. Adele Lewis, from the Medical Examiner's Office, was qualified as an expert witness by the trial court. She testified that one of her colleagues performed an autopsy on the victim. Dr. Lewis stated that the victim's body was severely burned and that most of her body suffered up to fourth degree burns. However, she said that the autopsy indicated that the victim was not alive at the time of the fire, as there was no sut found in her airway and the level of carbon monoxide in her blood was normal. Dr. Lewis also explained that an examination of the victim's brain revealed "that there was maybe a lack of blood supply to the brain for a period of time before death." She described that the victim's hyoid bone was broken, indicating that her cause of death was strangulation. Dr. Lewis also testified that the victim's blood tests revealed the presence of cocaine.

Detective Mike Roland, employed by the Metropolitan Nashville Police Department, testified that he responded to the scene of the car fire on May 29, 2001. He said that a check of the vehicle's license plate revealed that the car was registered to Frank Wilkerson. He recalled that the car was badly burnt inside and that he could see female remains behind the driver's seat in the floorboard. Detective Roland testified that he did not find a cell phone or purse belonging to the victim at the scene but that he eventually found her cell phone. He explained that he got the victim's phone records and saw that calls had been made on her cell phone after her death. Using the information from the call records, he found out that a man named Richard Jones began using the phone after he found it on a river bank under the interstate.

Detective Roland stated that the last call the victim made from her cell phone on the morning of her death was to Sonny Daly, her ex-brother-in-law,[1] at 3:09 a.m. Once he had that information, he obtained Sonny Daly's address and found out that Roger Daly also lived at the same address. Detective Roland first spoke to Sonny Daly, who told him that he knew the victim but that he did not have anything to do with her death. In July 2001, Detective Roland also spoke to the Defendant, who said that he knew the victim, but he denied seeing her on May 29, 2001.

On cross-examination, Detective Roland acknowledged that, in the early morning hours of May 29, 2001, there were multiple phone calls between the victim and Sonny Daly but none between the victim and the Defendant.

---

[1] Sonny Daly had been married to the victim's sister.

Audrey Garrett testified that the Defendant was one of her best friends and, a day or two after the victim's death, the Defendant called her and seemed very upset and distraught. She further recalled as follows:

> I guess he and Sonny had been getting high. And my understanding is that, you know, they didn't have anymore money and that Sonny had called [the victim]. And I believe [the Defendant] had said something, you know, like, we don't have any money type of thing. And Sonny said something like he would take care of it.
>
> And she showed up—my understanding is that she showed up and Sonny told [the Defendant] to stay in the house. And I guess it was taking a while or whatever. When he went out there—and he said he went and looked out the window and he saw Sonny choking [the victim] through the car window.

Ms. Garrett said that the Defendant told her that Sonny Daly came into the house and told the Defendant to follow him. She recalled the Defendant told her that he followed his brother and that "Sonny set the car on fire."

Ms. Garrett explained that she did not come forward with the information she had regarding the victim's murder until she met the victim's brother in a rehabilitation program. She recalled that he spoke about his sister's murder in group therapy, and she explained, "[Y]ou can't sit there and watch a man cry about his sister and not—when you know the answer." At that point, she said she told the victim's brother to have the detectives contact her. When asked why she did not notify police sooner, she replied, "For one, I'm afraid of Sonny." She later elaborated, "He's a very big guy and he's very violent. . . . [H]urting a woman is nothing to Sonny."

Stephen Sanders testified that he was in prison for committing multiple aggravated burglaries and thefts. He described a conversation that he had with the Defendant, in May or June 2006, as follows:

> He said that him and his brother had called this girl to order some dope and when they got over—when she got over there that somehow it went bad and they was going to rob her. And at one time [the Defendant] held her and his brother had choked her or something. And the next thing I know is he said that they took her out and burned her.

-4-

Additionally, Mr. Sanders recalled that the Defendant told him that he and his brother threw the victim's purse in a river or creek.

On cross-examination, Mr. Sanders admitted that the detectives he spoke to told him that they would talk to the District Attorney and try to get him released from prison and put on probation, but that they did not promise him anything.

S.D., Sonny Daly's daughter, was seven years old at the time of the victim's death. She testified that one day when she was visiting her father, the Defendant, the victim, and the victim's daughter were also there. She said she overheard her father tell the Defendant that "he was going to take [the victim's] money and her drugs and her jewelry." S.D. testified that she did not hear the Defendant say anything in response. She recalled that the day after her father made this statement, she found out that the victim had died.

On cross-examination, S.D. acknowledged that she was interviewed by the police in March 2007 but did not tell them that she heard this statement the day before the victim was killed. She admitted that she initially told the police she did not remember when she overheard her father's comment but that she later told them she heard it on a Saturday.[2]

Detective Lee Freeman, from the Metropolitan Nashville Police Department's homicide cold-case unit, interviewed the Defendant on March 5, 2007. The jury heard an audio recording of the interview, in which the Defendant explained that, in the early morning hours of May 29, 2001, his brother, Sonny Daly, ordered crack from the victim. He then elaborated as follows:

> [S]he came by, and my brother just told me wait in the house. He had to go out to the car. I said all right. Well he went out to the car, and a few minutes later came inside and asked me to follow him. And so I took my car, followed him. And uh, next thing I know we go down some dead end road. He told me to park—he stopped the car and told me to wait right there, and he pulls on down to this dead end road. Stopped there, and next thing I know when he got in the car he told me to pull off quietly, cause my car was so loud, I didn't have a muffler. And as I'm pulling off I look in my rearview mirror and I see a car that's engulfed in flames.

The Defendant stated that these events occurred around 3:00 a.m. He also clarified that, when his brother asked the Defendant to follow him, the Defendant drove his vehicle and Sonny Daly drove the victim's husband's white car. The Defendant said that he did not

---

[2] Later in the trial, proof was introduced that May 29, 2001, was a Tuesday.

see the victim anywhere at this point. The Defendant also recalled that his brother had the victim's purse when he got back in the Defendant's car and that they later threw the purse in the river. The Defendant said that he did not think his brother took anything from her purse and that all Sonny Daly got from her was the drugs. The Defendant recalled that whenever he asked his brother what was going on, Sonny Daly would tell him not to ask and that the less he knew the better. However, the Defendant also said, "I knew he had to do something to hurt her [be]cause he burnt the car, and I never seen her again after that. So I knew he'd done hurt her."

When asked whether he knew Sonny Daly was going to rob the victim, the Defendant said, "[H]e was just gonna take the dope and tell her that he didn't have no money right now. But I didn't know he was gonna go out and do what he was gonna do to—for the dope, you know. It—I knew he was just gonna take the dope. That I did know."

The Defendant said that, after the two men got back home from leaving the victim's car on the dead-end street, the two men "did some more dope." He elaborated, "I guess that the dope he got from her." Regarding how much crack the victim had brought to their house that night, the Defendant explained, "It wasn't much . . . I know [Sonny Daly] told her he wanted to get about a 40, which is just a gram. I don't even think it was that much, to be honest with you."

The Defendant presented the testimony of Rick Berry, a private investigator, who said that he and defense counsel interviewed Mr. Sanders on August 18, 2008. He recalled that Mr. Sanders said, "I'm not certain if both [the Defendant] and Sonny had participated in [the victim's death] or if only one of them had participated or both participated." Mr. Berry also testified that Mr. Sanders told them that he had difficulty remembering the conversation between he and the Defendant because his drug use affected his memory.

The jury convicted the Defendant of first degree murder in the perpetration of a theft, first degree premeditated murder, aggravated robbery, setting fire to personal property or land, and abuse of a corpse. The trial court merged the two murder convictions and sentenced the Defendant to life imprisonment. Regarding his other convictions, the trial court sentenced the Defendant as a Range II, multiple offender to sixteen years for aggravated robbery, eight years for setting fire to personal property, and four years for abuse of a corpse. The trial court ordered that the setting fire to personal property and abuse of a corpse sentences run concurrent with each other but consecutive to the Defendant's life sentence, for a total effective sentence of life plus eight years. The Defendant now appeals.

**Analysis**

In this direct appeal, the Defendant raises the following issues for our review: (1) The State presented insufficient evidence to support his convictions for first degree murder in perpetration of a theft, first degree premeditated murder, aggravated robbery, setting fire to personal property or land, and abuse of a corpse; (2) The trial court erred in failing to require the State to elect or specify the objects of the theft with regard to the first degree murder in perpetration of a theft count and the aggravated robbery count; (3) The State failed to prove an underlying felony to support the Defendant's "felony murder" conviction; (4) The trial court erred in failing to grant a mistrial when Detective Roland testified that the Defendant had a criminal history; (5) The trial court erred when it allowed a photograph of the victim's charred body into evidence; and (6) The trial court erred when it allowed testimony regarding Sonny Daly's assault of Mr. Sanders.

**I. Sufficiency**

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

As the jury was instructed regarding criminal responsibility, we note that Tennessee Code Annotated section 39-11-402 provides that "[a] person is criminally responsible for an offense committed by the conduct of another if: . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." This statute codifies the longstanding common law theories of "accessories before the fact and aiders and abettors." Tenn. Code Ann. § 39-11-402, Sentencing Commission Comments. However, criminal responsibility is not itself a separate crime; rather, "[i]t is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

Under a theory of criminal responsibility, "[p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have played a physical role in the crime in order to be held criminally responsible for the crime. State v. Caldwell, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Rather, to be held criminally responsible for the acts of another, the defendant need only "associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); see also State v. Steven Nelorn Hampton, Jr., No. M2004-00704-CCA-R3-CD, 2005 WL 677279, at *5 (Tenn. Crim. App., Nashville, Mar. 24, 2005) (finding sufficient evidence to convict the defendant of especially aggravated robbery under a criminal responsibility theory because he admitted that he shared in the proceeds of the robbery, was present at the scene of the crime, and was with his co-defendants both before and after the commission of the crime).

## A. First Degree Murder in Perpetration of a Theft

First degree murder includes "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft." Tenn. Code Ann. § 39-13-202(a)(2). The mental state required for conviction under this subsection is the intent to commit the underlying offense; in this case, theft. See Tenn. Code Ann. § 39-13-202(b). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. Finally, we note that our supreme court has stated that, although the killing may precede, coincide with, or follow the underlying offense, it will still be considered as occurring "in perpetration of" the underlying offense, "so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999).

After our review, we conclude that the State presented sufficient evidence for a rational trier of fact to find the Defendant guilty of first degree murder in perpetration of a theft. The testimony presented indicated that the victim died from strangulation and her body was left in her husband's vehicle, which was set on fire. Mr. Wilkerson testified that his wife left their house around 3:00 a.m. on May 29, 2001. Immediately preceding her departure, he observed her talking on the telephone in a secretive manner. The victim's phone records revealed that she and Sonny Daly exchanged multiple phone calls that morning, with her last call being placed to him at 3:09 a.m. The Defendant told Detective Freeman that his brother ordered crack from the victim and that "he was just gonna take the dope" from her, as his brother did not have any money to pay for it. The Defendant recalled that, when the victim came to their house, Sonny Daly went outside and told the Defendant to stay in the house. Later, the Defendant followed in his vehicle as Sonny Daly drove the victim's husband's car and left it on a dead-end street. The Defendant then saw the car engulfed in flames. The Defendant admitted, "I knew he had to do something to hurt her [be]cause he burnt the car, and I never seen her again after that. So I knew he'd done hurt her." After they got back to their house, the two men "did some more dope" that the Defendant "guess[ed]" was "the dope he got from her."

Additionally, the Defendant told at least two other people what happened to the victim. Ms. Garrett testified that the Defendant told her that he and Sonny Daly "had been getting high" and that "they didn't have anymore money." She said that the Defendant informed her that he witnessed Sonny Daly choking the victim. Mr. Sanders testified that the Defendant told him that he and Sonny Daly "called this girl to order some dope" and "somehow it went bad and they was going to rob her." Mr. Sanders also said the Defendant divulged that "at one time [the Defendant] held her and his brother had choked her or something." Finally, S.D., Sonny Daly's daughter, testified that she overheard her father tell the Defendant that "he was going to take [the victim's] money and her drugs and her jewelry."

Thus, after reviewing the evidence presented, we conclude that the State presented sufficient evidence for a rational trier of fact to find the Defendant guilty of first degree murder in perpetration of a theft beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

### B. First Degree Premeditated Murder

Tennessee Code Annotated section 39-13-202(a)(1) states that "[a] premeditated and intentional killing of another" is first degree murder. The statute further provides that "'premeditation' is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). However, this Court has noted that "[p]roof of premeditation is inherently

circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime." State v. Gann, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007); see also Bass v. State, 231 S.W.2d 707, 711 (Tenn. 1950) ("Both premeditation and deliberation may be inferred from the circumstances of a homicide."). Specifically, the following factors have been used to support a finding of premeditation:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing.

State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004). Our supreme court has also commented that "evidence of repeated blows is relevant to establish premeditation, although this evidence alone is not sufficient to establish premeditation." Id.

We conclude that, in the light most favorable to the State, there was sufficient evidence for a rational trier of fact to convict the Defendant of first degree premeditated murder. The State presented evidence that Sonny Daly intended on robbing the victim and lured her to his and the Defendant's house by ordering more crack cocaine, even though he did not have any money to pay for it. Mr. Sanders testified that the Defendant told him that, when the victim arrived at their house, the Defendant held her while his brother choked her. In our view, strangulation, much like repeated blows, is relevant to demonstrating premeditation because strangling someone to death requires constant force over a period of time. Additionally, the evidence presented demonstrated that the Defendant and his brother attempted to destroy evidence of the murder by setting the victim's car on fire, with her body inside. After they left the victim's car on the dead-end street, the two men went home and "did some more dope." Around sunrise, they ventured out again to throw the victim's purse in the river. The evidence was sufficient to support the jury's finding of premeditated first degree murder. The Defendant is not entitled to relief on this issue.

### C. Aggravated Robbery

Tennessee Code Annotated section 39-13-401(a) provides, "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Aggravated robbery is robbery "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a)(2).

In the light most favorable to the State, the evidence was sufficient for a rational trier of fact to convict the Defendant of aggravated robbery. S.D. testified that she overheard her

father tell the Defendant that "he was going to take [the victim's] money and her drugs and her jewelry." The Defendant admitted that he and his brother had no money, but that his brother called the victim and ordered more crack cocaine. The Defendant also told Detective Freeman that he knew that his brother **"was just gonna take the dope"** from the victim. Mr. Sanders testified that the Defendant told him that he and his brother called the victim to order some dope, that they were "going to rob her" and, when it "went bad," the Defendant held her while his brother choked her. Moreover, after they left her body and car burning on a street in South Nashville, the Defendant and his brother "did some more dope" that the Defendant "guess[ed]" was "the dope he got from her." Thus, we conclude that the evidence was sufficient to support the Defendant's conviction for aggravated robbery beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

### D. Setting Fire to Personal Property or Land

Count four of the original indictment charged the Defendant with aggravated arson. See Tenn. Code Ann. § 39-14-302. However, on the first day of the trial, before jury voir dire began, the State asked to amend the indictment, at which time the following transpired:

> [Prosecutor]: . . . [W]e would ask to address the indictment in this case and would actually be in the benefit of the—we would amend it to the benefit of the defendant in that, the aggravated arson count that he is charged with in count four.
>
> [Trial Court]: Uh-huh.
>
> [Prosecutor]: The victim in this case was already deceased when she was burned and the car was set on fire; therefore, there was no serious bodily injury due to the arson. Therefore, we would ask that it be amended from aggravated arson down to regular arson.
>
> [Trial Court]: Do you have any objection to that?
>
> [Defense Counsel]: No, sir, I do not.
>
> [Trial Court]: All right. Amend the indictment and I guess what you would be doing would be—that's count.
>
> [Prosecutor]: That's count four, Your Honor.
>
> [Trial Court]: Just leave out suffered serious bodily injury?

[Prosecutor]: Yes, Your Honor.

[Trial Court]: As a result of the fire or explosion.

[Prosecutor]: Yes, Your Honor.

[Trial Court]: And just have, in other words, did damage certain property, Nissan Altima, by means of fire or explosion without consent of all person [sic] having possession (inaudible) of the secured interest in the property in violation of Tennessee Code Annotated 39-14-302; is that still going to be the section or what?

[Prosecutor]: Let me double check that, Your Honor.

[Trial Court]: That might be something you need to look at.

What is this count five, abuse of a corpse?

[Prosecutor]: Yes, Your Honor. Your Honor, it would be 301.

[Trial Court]: All right. Barbara will amend that.

The record includes the amended indictment for count four, which states as follows:

> **SONNY LEE DALY and ROGER EUGENE DALY**
> on the **29th** day of **May, 2001,** in Davidson County, Tennessee and before the finding of this indictment, knowingly did damage certain property, to wit: **1999 Nissan Altima,** by means of a fire or explosion, without the consent of all persons having a possessory, proprietary, or security interest in the property, in violation of Tennessee Code Annotated § 39-14-301 and against the peace and dignity of the State of Tennessee.

Arson, as codified by Tennessee Code Annotated section 39-14-301, was not the proper statute for the instant offense, as that section applies when a person "knowingly damages any structure by means of fire or explosion." See Tenn. Code Ann. § 39-14-301(a) (emphasis added). Unfortunately, that one clerical mistake was the root of a couple of other errors. We note that the judgment entered for count four lists arson, a Class C felony, as the conviction offense and the relevant statute as Tennessee Code Annotated section 39-14-301. Accordingly, the trial court sentenced the Defendant to eight years in the Department of Correction, which is within Range II for a Class C felony.

-12-

In each of their original briefs to this Court, both the Defendant and the State only cited to our statute for setting fire to personal property, Tennessee Code Annotated section 39-14-303,[3] with regard to count four, and both parties argued sufficiency of the evidence in relation to that statute, not section 39-14-301. On April 1, 2011, this Court ordered additional briefing[4] and requested that the following issues be addressed:

(1) Whether the amended indictment is sufficient to support a conviction for the offense of setting fire to personal property or land, Tennessee Code Annotated section 39-14-303; and

(2) Whether the jury instructions were sufficient to support a conviction for the offense of setting fire to personal property or land, Tennessee Code Annotated section 39-14-303.

Regarding the first issue, the State argues that, even though it recited the wrong statutory section, the amended indictment was sufficient to give the Defendant notice that he was being charged for setting fire to personal property or land. We agree.

Our legislature has stated as follows:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. In no case are the words "force and arms" or "contrary to the form of the statute" necessary.

---

[3] Our statute entitled, "Setting fire to personal property or land," provides the following:

> (a) A person commits arson who knowingly damages any personal property, land, or other property, except buildings or structures covered under § 39-14-301, by means of a fire or explosion:
> (1) Without the consent of all persons who have a possessory or proprietary interest therein; or
> (2) With intent to destroy or damage any such property for any unlawful purpose.
> (3) A violation of this section is a Class E felony.

Tenn. Code Ann. § 39-14-303.

[4] Only the State filed a supplemental brief. In our April 1, 2011 order, we stated that, if he so desired, the Defendant could file a response to the State's supplemental brief. However, he chose not to file one.

Tenn. Code Ann. § 40-13-202. The amended indictment used the correct language in alleging the charge of setting fire to personal property or land, but it referenced Tennessee Code Annotated section 39-14-301 instead of section 39-14-303. This Court has stated that a criminal charge should state the facts constituting the offense and that "it is not necessary to add that the offense is contrary to a statute." McCracken v. State, 489 S.W.2d 48, 51 (Tenn. Crim. App. 1972). In McCracken, we treated an erroneous statutory section as surplusage and found that it was not improper to try the Defendant on the charge based on the substance of the presentment. Id. In State v. Wade Tyler, No. M2009-01762-CCA-R3-CD, 2011 WL 300145, at *8 (Tenn. Crim. App., Nashville, Jan. 21, 2011), this Court recently examined a similar scenario in which the indictment contained the correct language for a charge of statutory rape by an authority figure but referenced the statute for sexual battery by an authority figure. We concluded that the indictment was valid and noted that "a clerical error on an indictment does not render an indictment void as long as the indictment correctly states the offense." Id. Thus, we agree with the State that the indictment clearly charged the Defendant with setting fire to the Nissan Altima and that the erroneous statutory reference was surplusage.

The trial court gave the following instructions to the jury:

Count four. I shall now proceed to explain to you what in law it takes to constitute the offense as charged in Count Four of the Indictment in this case. Arson. For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements: One, that the defendant knowingly damaged certain property by means of fire or explosion; and two that the defendant did so without the consent of all persons who have a possessory, proprietary or security interest therein.

After reviewing the amended indictment and the jury instructions, we conclude that the instructions accurately reflected the elements of the offense of setting fire to personal property or land, as codified in Tennessee Code Annotated section 39-14-303.

Finally, we return to the original issue—the sufficiency of the evidence regarding this count. We conclude that the State did present sufficient evidence for the jury to convict the Defendant of setting fire to personal property or land. The Defendant admitted that he followed his brother, who was driving the victim's husband's car, to a dead-end street in South Nashville. He waited while his brother left the Nissan Altima at the end of the street and set it on fire. Then, he drove his brother back home. Mr. Sanders testified that the Defendant "said that they took [the victim] out and burned her." Ms. Garrett recalled the Defendant told her that he followed his brother and that his brother set the car on fire. In his

interview with Detective Freeman, the Defendant claimed that he did not see the car was engulfed in flames until they left and he looked in his rearview mirror, but the jury was free to reject his version of events and draw any reasonable inferences from the evidence. Finally, we note that Mr. Wilkerson testified that he did not give anyone permission to burn his Nissan Altima. In the light most favorable to the State, we conclude that the evidence was sufficient to support the Defendant's setting fire to personal property conviction.

Nonetheless, we must remand to the trial court for two reasons. First, the judgment for count four must be corrected to reflect the proper code section, Tennessee Code Annotated section 39-14-303, and the proper offense, setting fire to personal property or land. Second, as the Defendant was erroneously sentenced within the range for a Class C felony, the trial court must resentence the Defendant within the range for a Class E felony.

### E. Abuse of a Corpse
The Defendant argues that the evidence presented was not sufficient to support his conviction for abuse of a corpse beyond a reasonable doubt. The State argues that the proof establishes the Defendant's guilt based on his criminal responsibility for the acts of Sonny Daly.

"A person commits an offense who, without legal privilege, knowingly: (1) Physically mistreats a corpse in a manner offensive to the sensibilities of an ordinary person . . . ." Tenn. Code Ann. § 39-17-312(a)(1).

The Defendant admitted that he saw the victim when she came over to his and his brother's house around 3:00 a.m. on May 29, 2001. He also acknowledged that when he left the house and followed his brother, who was driving Mr. Wilkerson's car, he did not see the victim at that time. He then waited while his brother left the Nissan Altima at the end of a dead-end street and set it on fire. Indeed, when Detective Freeman interviewed the Defendant, he admitted, "I knew he had to do something to hurt her [be]cause he burnt the car, and I never seen her again after that. So I knew he'd done hurt her." The jury was free to draw the reasonable inference that the Defendant knew the victim's body was inside the car when he waited while his brother set it on fire and then proceeded to drive his brother back home. The Defendant is not entitled to relief on this issue.

## II. Election
The Defendant argues that the trial court erred in failing to require the State to elect or specify the object of the theft—either the crack, car, purse, or cell phone—with regard to the first degree murder in perpetration of a theft count and the aggravated robbery count. However, in our review of the record, we have discovered that count three of the indictment, the aggravated robbery count, does specify the object stolen as "crack cocaine of value." The

record also indicates that the indictment was read to the jury, however the transcript does not contain a verbatim memorialization of what was said. As we have no reason to believe the indictment was not recited in its entirety, we conclude that the Defendant's argument on this issue is meritless because the jury was informed of what the Defendant was accused of taking with regard to the aggravated robbery count.

Turning to the Defendant's argument regarding the first degree murder in perpetration of a theft count, we note that our supreme court has "held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). The doctrine of election "ensure[s] that the jurors deliberate over and render a verdict based on the same offense." Id. However, in arguing that the State should have elected what specific item was taken, the Defendant overlooks the fact that election is only necessary "when the evidence indicates the defendant has committed multiple offenses against a victim." Id. (emphasis added).

In State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996), our supreme court stated that "[m]ultiplicity concerns the division of conduct into discrete offenses, creating several offenses out of a single offense" and provided criteria to evaluate "whether offenses are 'stacked' so as to be multiplicitous." The three factors the Phillips court articulated are as follows:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
>
> 2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and
>
> 3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Id. (footnotes omitted). "Additional factors such as the nature of the act; the time elapsed between the alleged conduct; the intent of the accused, i.e., was a new intent formed; and cumulative punishment may be considered for guidance in determining whether the multiple convictions violate double jeopardy." State v. Epps, 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998). However, "[w]here several articles are stolen from the same owner at the same time and place, only a single crime is committed." Id. at 745-46.

In State v. Epps, the defendant was accused of burglarizing the victim's home, stealing four weapons, and attempting to steal an automobile. Id. at 745. This Court noted that "[w]hether the acts of the defendant constitute several thefts or one single crime must be determined by the facts and circumstances of each case." Id. at 746. The Epps court also explained, "If each taking is the result of a separate intent, each is a separate crime; however, where the takings are all pursuant to a single intent, there is but a single larceny." Id. This Court vacated the defendant's attempted theft conviction after determining that "the theft and the attempted theft arose from a single intent to steal, were contiguous in time and place, and involved the same victim." Id.

Based on the proof presented at trial, we cannot conclude that multiple theft offenses were committed against the victim in the instant case. Thus, we reject the Defendant's argument that the trial court erred when it refused to instruct the State to specify which object was taken with regard to the first degree murder conviction in perpetration of a theft count. The Defendant is not entitled to relief on this issue.

## III. Felony Murder

Count one of the indictment alleged that the Defendant and Sonny Daly killed the victim "during the perpetration of or attempt to perpetrate a theft." The Defendant argues that, because theft can be a misdemeanor, the State failed to prove an underlying felony to support his "felony murder" conviction.

Although "felony murder" is a phrase often used to describe Tennessee Code Annotated section 39-13-202(a)(2), the statute does not mandate that the underlying offense must be a felony. The relevant portion of the statute, at the time the instant offenses were committed, provided, "First degree murder is . . . [a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2001) (emphasis added). Moreover, regarding issues of statutory construction, our supreme court has stated as follows:

> When construing statutes, we are required to ascertain and effectuate the legislative intent and purpose of the statutes. State v. Walls, 62 S.W.3d 119 (Tenn. 2001). We should "assume that the legislature used each word in the statute purposely and that the use of [each] word[] conveyed some intent." State v. Levandowski, 955 S.W.2d 603, 604 (Tenn. 1997). Further, courts must presume that the legislature is aware of prior enactments and of the state of the law when passing legislation. Id. Legislative intent must be derived from the plain and ordinary meaning of the statutory language if the statute is devoid of ambiguity. Mooney v. Sneed, 30 S.W.3d 304, 306 (Tenn. 2000).

Dixon v. Holland, 70 S.W.3d 33, 37 (Tenn. 2002). Thus, when looking at the plain and ordinary meaning of the statute, we conclude that there can be no doubt that the legislature intended for a killing of another in the perpetration of any theft, even misdemeanor theft, to be punishable under the first degree murder statute. See also State v. Mila Love, No. W1999-01957-CCA-R3-CD, 2001 WL 935340, at *1 n.2 (Tenn. Crim. App., Jackson, Aug. 17, 2001) ("We note the fact that the term 'felony murder' is a misnomer in that one may be convicted of first degree murder in the perpetration of or attempt to perpetrate misdemeanor theft."). The Defendant is not entitled to relief on this issue.

## IV. Testimony About the Defendant's Criminal History

During Detective Roland's testimony, he stated as follows:

[T]he phone number that she called, I don't recall the number but it was listed [sic] it belonged to a Sonny Daly. With that information we began searching the computer, criminal histories and that sort of thing and located a Sonny Daly. I don't recall the address, I apologize.

But also at that address there was a Roger Daly listed there that had a criminal history also. Obviously that is somebody that would be very important to talk to. So we went to the address, the home address and I think we watched it several times. We didn't see anybody. Finally located Sonny Daly and talked to him and asked him to come in for an interview and he didn't want to come to the office for an interview, and we talked to him at the house.

He basically told us that he was married to Amanda, which [sic] one of [the victim's] sisters but they were currently separated. They hadn't been together—I don't remember how long he said, months at least.

At that point, the trial court excused the jury and asked defense counsel if he wanted the trial court to instruct the jury to disregard Detective Roland's comment about the Defendant's criminal history. Defense counsel replied, "I would prefer to leave it alone. I didn't anticipate that coming out. So [sic] didn't want to object and then move to strike and all of that for fear of causing more attention to it." However, defense counsel did make a motion for a mistrial, which the trial court denied. In this appeal, the Defendant argues that the trial court erred when it failed to grant his motion to declare a mistrial after Detective Roland's comment.

"A mistrial is usually appropriate in a criminal case only where there is a 'manifest necessity.'" State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Id. An abstract formula should not be applied mechanically in determining whether a mistrial was necessary, and all relevant circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993). Whether a mistrial should be granted is a determination left to the sound discretion of the trial court. Reid, 164 S.W.3d at 342 (citing State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994)). The trial court's decision should not be overturned absent an abuse of discretion. Id. Additionally, the party arguing that a mistrial should have been granted bears the burden of establishing its necessity. Id. (citing Williams, 929 S.W.2d at 388).

In State v. Demetrius Holmes, this Court noted that Tennessee does not have "any exacting standard" for determining when a mistrial should be declared, but suggested that the following criteria be examined when a witness has made an improper comment: "(1) whether the improper testimony resulted from questioning by the state, rather than having been a gratuitous declaration, (2) the relative strength or weakness of the state's proof, and (3) whether the trial court promptly gave a curative instruction." No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *4 (Tenn. Crim. App., Knoxville, Nov. 30, 2001) (footnote omitted); see also State v. Bennie Nelson Thomas, Jr., No. W2004-00498-CCA-R3-CD, 2004 WL 2439405, at *4 (Tenn. Crim. App., Jackson, Nov. 1, 2004) (concluding that the trial court did not err when it failed to declare a mistrial when one witness referred to a "previous sale" with the defendant, who was on trial for selling crack cocaine).

We first note that Detective Roland's comment was not elicited by the State. His fleeting comment came during a lengthy answer to a question by the prosecutor about what he did after he checked the victim's phone records. Second, we note that the State's proof in this case was relatively strong. Not only did the jury hear Detective Freeman's interview with the Defendant, in which he implicated himself in the victim's robbery, the arson, and the abuse of the victim's corpse, they also heard Ms. Garrett and Mr. Sanders relay what the Defendant had told them about his involvement in the victim's death. Third, the trial court offered to give a curative instruction to the jury but the Defendant declined such an instruction. Additionally, as the trial court noted in its order denying the Defendant's motion for a new trial, "[T]he statement by Detective Roland was of minimal prejudicial value against the Defendant since the Defendant admitted to participation in illegal acts by his own statements to police of smoking drugs." Thus, after reviewing the record, we conclude that the trial court did not abuse its discretion when it failed to declare a mistrial. The Defendant is not entitled to relief on this issue.

## V. Admissibility of Photograph of Victim's Charred Body

The Defendant contends that the trial court erred when it allowed the State to introduce a photograph of the victim's charred body into evidence. The photograph depicts a severely burned body lying on an autopsy table.

When discussing its decision to allow the State to present the photograph, the trial court commented as follows:

> The State, after all, does have the burden to prove the abuse of a corpse, that's one of the charges is [sic] in this case. And I think the elements of that are that you have to prove that this corpse was physically mistreated in a manner that is offensive to a [sic] sensibility of an ordinary person. And this picture here shows the injuries that are a result of the alleged abuse that the [S]tate has the burden of proving, and I'm going to allow this. I think there is probative value to show this that shows something more than the pictures of the car, which is just the charred remains of someone. This is in a state of undress and actually shows it even more. So I'm going to allow the State to show the picture, the second picture that is her at the medical examiner's office.[5]

Tennessee courts follow "a policy of liberality in the admission of evidence," including photographs. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). Accordingly, "the admissibility of photographs lies within the discretion of the trial court whose ruling . . . will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. However, "a photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence." State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); see also Tenn. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). "Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character." Faulkner, 154 S.W.3d at 67. However, "the probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact." Id.; see also Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

---

[5] The State wanted to admit another photograph, depicting the victim's body in the car, but the trial court found that the prejudicial effect outweighed its probative value.

We cannot conclude that the trial court abused its discretion when it allowed the photograph to be admitted into evidence. As the trial court noted, the Defendant was charged with abuse of a corpse and the photograph was directly relevant to that count, as it showed the extent to which the victim's body was mistreated. See Tenn. Code Ann. § 39-17-312(a)(1) ("A person commits an offense who, without legal privilege, knowingly: (1) Physically mistreats a corpse in a manner offensive to the sensibilities of an ordinary person . . . ."). Moreover, although the photograph is not pleasant to look at, we conclude that its probative value outweighs any unfair prejudicial effect. The Defendant is not entitled to relief on this issue.

## VI. Admissibility of Testimony Regarding Sonny Daly's Assault on Mr. Sanders

During the State's direct examination of Mr. Sanders, the prosecutor started to ask him about the black eye he had at the time of the trial. The Defendant objected, but the trial court allowed the line of questioning, and the following colloquy then occurred between the prosecutor and Mr. Sanders:

> Q: When did you get your black eye?
>
> A: Yesterday.
>
> Q: Who gave you the black eye?
>
> A: Sonny Daly.
>
> Q: And was anything said to you as he was hitting you?
>
> A: Yes. I was coming from my institution yesterday and Mr. Daly said, you testifying against me? And I said, yes, I am. Well, he really didn't say too much more. And he said, I'm going to kill you, you know that right?
>
> So when we got here yesterday, you know, they took the handcuffs off of him and I was standing there still restrained, and he pushed the officer down and hits me in my eye and he is still hollering I am going to kill you.

On cross-examination, defense counsel clarified that the Defendant was not present at the time of this incident. In this appeal, the Defendant argues that the trial court erred when it allowed testimony regarding Sonny Daly's assault on Mr. Sanders.

In order to be admissible at trial, evidence must be relevant and its probative value must outweigh the danger of unfair prejudice. See Tenn. R. Evid. 401, 403. In the instant

case, the testimony was relevant because both the State and the Defendant advanced the theme that Sonny Daly was a violent man, and played a major role in the victim's death, into their theories of the case. In fact, in the cross-examination of the victim's mother, the very first witness to testify at the trial, the Defendant sought to elicit testimony that Sonny Daly was "domineering," "violent," and a "[p]retty cold person." We conclude that the trial court did not err when it allowed Mr. Sanders' testimony. Mr. Sanders' testimony was relevant, as both the State and the Defendant had made Sonny Daly's propensity for violence a theme throughout the case. The evidence was not unfairly prejudicial toward the Defendant, because Mr. Sanders testified that it was Sonny Daly, not the Defendant, who hit and threatened him. The Defendant is not entitled to relief on this issue.

**Conclusion**

Based on the foregoing authorities, we remand this case to the trial court for entry of a corrected judgment for count four for setting fire to personal property or land, a Class E felony, and for resentencing for that conviction. In all other respects, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE